JULIA A. GOULD *vs.* CITY OF BOSTON.

Suffolk.    March 8. — May 6, 1876.    AMES & MORTON, JJ., absent.

In the city of Boston, public footways may exist by prescription, which the city is bound to keep in repair, and is responsible for defects in, under the Gen. Sts. *c.* 44, §§ 1, 21, 22, 26.

An ancient public footway two feet wide, lying between lands of the city of Boston and of an individual owner, was by an agreement between the city and such owner widened to twelve feet, each party contributing a strip of land for that purpose, with mutual covenants that it should be used only for foot passengers. It was subsequently used by the public and kept in repair by the city. *Held,* that the city was liable, as for a highway, for a personal injury to a foot passenger occasioned by a defect therein.

TORT for an injury sustained by the plaintiff through a defect in a certain way called City Hall Avenue, leading from School Street to Court Square in the city of Boston.

At the trial in this court, before *Ames*, J., the plaintiff introduced evidence as to the nature of the alleged defect in the way and the injury sustained by her. A question was then raised, whether the way in question was a " highway, town way, causeway or bridge " for which the city was responsible within the Gen. Sts. *c.* 44; and the judge, deeming it to be expedient that the case should be so far tried as to determine whether any defect or want of a repair existed in the way, and what amount of damages the plaintiff should recover, if any, directed the trial to proceed, reserving for future consideration the question so raised. The trial therefore proceeded upon the assumption that the way came within the Gen. Sts. *c.* 44, and a verdict was rendered for the plaintiff.

It appeared that City Hall Avenue was, for years beyond memory, a footpath between the City Hall and the estate of an adjoining proprietor, paved with bricks, open to public use, and

continually used, by all persons having occasion to pass over the same, as a public thoroughfare; that, for a long series of years before the year 1841, there had been an open passageway, two feet in width, between the two estates or lots of land; that on April 27, 1841, the city of Boston and William J. Niles executed the following indenture:

" Whereas the parties aforesaid are respectively owners of two adjoining real estates on School Street, in Boston aforesaid, and have for their mutual accommodation agreed to use, as a passageway in common, a strip of land lying on each side of and adjacent to the divisional line of their said estates, as hereinafter described:

" Now this indenture witnesseth, that the said city of Boston, in consideration of the several covenants and agreements to be performed on the part of the said William J. Niles and his heirs and assigns, doth hereby covenant and agree with him, and his heirs and assigns, in manner following, to wit, that the said city of Boston will and hereby does contribute and appropriate to and for the purposes of a passageway as aforesaid, and for no other purpose, the following parcel of the said city's land ; to wit, all that parcel or strip of land which is bounded on the east by the said divisional line of the two estates above mentioned, and on the west by a line beginning at a point in the northerly side of said School Street, twelve feet distant westerly from said divisional line, and from said point running northerly to the rear or northeasterly corner of the City Hall ; the parcel hereby so appropriated by said city being twelve feet wide on School Street and two feet wide on the rear line.

"And the said William J. Niles, in consideration of the covenants and agreements herein contained on the part of the said city of Boston to be performed, doth hereby, for himself and his heirs, executors and administrators, covenant and agree with the said city of Boston and its successors and assigns in manner following, to wit, that he, the said Niles, will and hereby does contribute and appropriate to and for the purposes of a common passageway as aforesaid, and for no other purpose, a triangular piece of his land aforesaid, bounded as follows; to wit, beginning at a point in the said divisional line of the two estates of the parties above mentioned, and at the distance of

ten feet northerly from the north side of said School Street, and from said point running northerly to a point in the rear line of said City Hall extended, and at the distance of seven feet easterly from the divisional line aforesaid, the triangular piece hereby so appropriated by said Niles being seven feet wide on said extended rear line, and running to the point at the place of beginning, which is ten feet distant northerly from School Street aforesaid.

" And the parties aforesaid mutually covenant that the two parcels appropriated as aforesaid, which together form a strip of land twelve feet wide on School Street aforesaid, and nine feet wide on the rear line aforesaid, shall be used by the parties and their assigns forever in common as a passageway for foot passengers, with all the rights and privileges incident to such a way.

" And it is further mutually covenanted and agreed that each of the parties and their assigns may, at their pleasure, respectively, project the eaves of any building over said passageway, in like manner and to the same extent as is usually practised in said city in the case of buildings standing upon the public streets thereof.

" And the said city of Boston further covenants to make and maintain, at its own expense, the said passageway, and also any fence which the said city may elect to place upon the western line thereof, and will grade the said passageway on a regular and convenient descent from front to rear, so that there shall be no steps in the same; and that the said city will, if the mayor and aldermen thereof shall deem it expedient, (but not otherwise,) place suitable posts at the entrance of said passageway on School Street, so as to exclude all except foot passengers therefrom; the said Niles hereby giving his assent to the placing of such posts.

" And the said Niles, for himself, his heirs, executors and administrators, further covenants with said city of Boston and its assigns, that he will not have or erect any stables or any stalls for horses nearer to said passageway than those are which he now has on his said estate; and that he will not have or make any passage, from his said estate to said common passageway, for horses, cattle, carts or carriages of any description, but only

for foot passengers; and further, that he will make and maintain a suitable support for the side of the bricks of the brick walk on his line of said common passageway, and a suitable wall or fence (if he shall elect to place anything other than a building or buildings along his said line;) provided, however, that he shall not be required to lay any foundation under the sidewalk.

" And the said city of Boston in like manner covenants that it will not have or make any passageway from its said estate into said common passageway, except for the use of foot passengers only; and further, that in case the said city shall at any time hereafter continue said common passageway towards Court Street, the said Niles shall have a right to use the same in common with and for the like purposes as the city shall use it, during such time as it shall be so continued.

" And the said city of Boston hereby further agrees that the promissory note heretofore given by said Niles to the said city for the sum of one thousand dollars, shall, upon the execution of these presents, be given up to him, he, on his part, agreeing to surrender thereupon his existing contract with said city in relation to the said premises, and to relinquish all claims whatever that he might or could have by virtue of said contract; which said delivery of said promissory note and surrender of said contract shall be, and hereby is, declared and agreed to be in full settlement of all manner of claims existing between the parties by reason of the premises.

" And the said city of Boston further agrees that the work requisite in the premises shall be completed as soon as the season will permit."

Upon the east side of the way, as established by the indenture and upon the land now or formerly of said Niles, are numerous shops and other buildings having their entrances from said way. Upon the other side there are no doors from the City Hall, or any part of the city's land, opening upon the avenue, the access to the hall being direct from School Street on one side, and from Court Square on the other. The passageway was not intended or used other than as a footway, except as herein stated. There was evidence tending to show that when the passageway was first opened to twelve feet wide, a step was removed, and cor-

tain posts, to prevent the passage of horses and teams, put down on School Street, but not so as to obstruct foot passengers; but that in 1853 said posts were removed, in order that the steam fire-engine, which was kept in the basement of the old City Hall building, opening on Court Square, might pass through this way, which was called Court Avenue; and that the steam fire-engine had passed through there while it was so kept, and that men on horseback had ridden through, but very seldom; but no carriages or teams, except the fire-engine, the avenue being paved with brick only, and being raised above the level of the carriageway in both Court Square and School Street to the level of the sidewalk, and bounded on each end by a stone curb; and there was no evidence that any sign or notice whatever had ever been put up showing that this was not a public way. The evidence also tended to show that the place where the accident happened was on the half of the passageway which was the land of the city. There was no evidence of any formal acceptance of the way by the city council as a public street, and although the same had been constructed and kept in repair by the city, it was contended, on its behalf, that it was in pursuance of said indenture and under their proprietary right only.

If in the opinion of the full court the avenue in question did not come within the provisions of the Gen. Sts. c. 44, the verdict was to be set aside and the case stand for trial; otherwise, judgment on the verdict.

*J. L. Stackpole & J. Healy*, for the defendant.

*B. F. Butler & S. W. Harmon*, for the plaintiff.

GRAY, C. J. In *Hemphill* v. *Boston*, 8 Cush. 195, the point decided was that the city of Boston was not liable for an injury to a horse and carriage by a defect in a way which had been laid out and dedicated as a footpath only. In *Oliver* v. *Worcester*, 102 Mass. 489, the decision was that a footpath across the common in the city of Worcester, which was not shown to have been laid out by municipal authority, or specially dedicated to the public use as a footpath, was not a highway for defects in which the city was liable to travellers under the Gen. Sts. c. 44, §§ 1, 22. But in each of those cases the court abstained from discussing the question how far it was competent for any officers or tribu-

nals to lay out public ways for foot passengers only. 8 Cush. 196. 102 Mass. 495.

For the purposes of the present case, it may be assumed that, before the St. of 1874, *c.* 299, cities and towns and their officers had no authority, under the general laws of the Commonwealth, to lay out, or to accept the dedication of footpaths, so as to make them liable to passengers for defects therein.

In *Tyler* v. *Sturdy*, 108 Mass. 196, an opinion to that effect was expressed; but it was held that public footpaths might be created by dedication, so as to give the public a right of way over them; and reference was made to several special statutes which authorized the selectmen of the town of Boston to lay out, widen and discontinue not only "streets and lanes," but "alleys" or footpaths. Sts. 1799, *c.* 31, § 3; 1804, *c.* 73; 1816, *c.* 90. And in the earlier case of *Commonwealth* v. *Boston*, 16 Pick. 442, Chief Justice Shaw considered the St. of 1799, *c.* 31, § 3, empowering the selectmen to lay out or widen any street, lane or alley of the town, and providing that the owners of buildings removed for that purpose should receive compensation in the manner pointed out by the acts directing the method of laying out highways, as a clear recognition that these terms, describing the different kinds of ways, "when used as applicable to this city, are deemed to be synonymous with public ways or highways."

Although the Gen. Sts. *c.* 44, § 1, requiring towns and cities to keep public ways in repair, mention only "highways, townways, streets, causeways and bridges," and §§ 21, 22, 26, making them responsible for defects therein, omit "streets" from the enumeration, all these sections are manifestly intended to include all ways authorized by general or special statute to be laid out by municipal authority for any kind of public travel, and to charge the city or town for injuries, occasioned by want of repair therein, to any traveller lawfully using them for the purpose for which they are intended and appropriated.

In view of the special statutes above referred to, the evidence introduced at the trial, tending to show that City Hall Avenue had been immemorially used by the public as a footpath, warranted the jury in finding that it had been lawfully laid out, by the municipal authorities or otherwise, as a footway, and

was a public way by prescription, which the city was bound to keep in repair. *Reed* v. *Northfield*, 13 Pick. 94. *Williams* v. *Cummington*, 18 Pick. 312. *Folger* v. *Worth*, 19 Pick. 108. *Commonwealth* v. *Belding*, 13 Met. 10. *Jennings* v. *Tisbury*, 5 Gray, 73. If such was the fact, the widening in 1841, by agreement between the city owning the land on one side and the private owner of the land on the other, did not alter the character of the way.

No reason therefore is shown by the report before us why there should not be                    .        *Judgment on the verdict.*